**BRODSKY & SMITH, LLC**
Evan J. Smith, Esquire
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Phone:  (877) 534-2590
Facsimile: (610) 667-9029
esmith@brodsky-smith.com

*Attorneys for Plaintiff George Assad*

*[Additional Counsel Listed Below]*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

|  |  |
|---|---|
| GEORGE ASSAD, | : |
| Plaintiff, | : |
| v. | : |
| CERES, INC., CHERYL P. MORLEY, PASCAL BRANDYS, RICHARD FLAVELL, ROBERT GOLDBERG, RICHARD HAMILTON, LAND O' LAKES, INC., AND ROMAN MERGER SUB, INC., | : |
| Defendants. | : |

Case No.:

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff George Assad ("Plaintiff"), by his undersigned attorneys, for this complaint against Defendants (defined below), alleges upon personal knowledge with respect to himself and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE CASE**

1.      Plaintiff brings this action in connection with a proposed transaction announced on June 17, 2016 (the "Proposed Transaction") pursuant to which Ceres, Inc. ("Ceres" or the "Company") will be acquired by Land O' Lakes, Inc. ("Parent") through its wholly-owned subsidiary, Roman Merger Sub, Inc. ("Merger Sub," and together with Parent, "Land O' Lakes").

2.      On June 16, 2016, Ceres's Board of Directors (the "Board" or the "Individual Defendants," and together with Ceres and Land O' Lakes, "Defendants") caused Ceres to enter into an agreement and plan of merger (the "Merger Agreement"), pursuant to which stockholders of Ceres will receive $0.40 in cash for each share of Ceres common stock held.

3.      On July 1, 2016, Defendants issued materially incomplete disclosures in the Solicitation/Recommendation Statement (the "Solicitation Statement") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.  The Solicitation Statement is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.

4.      Accordingly, Plaintiff alleges herein that Defendants violated Sections 14(e), 14(d), and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Solicitation Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(e), 14(d), and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Ceres common stock.

CLASS ACTION COMPLAINT

9.      Defendant Ceres is a Delaware corporation and maintains its principal executive offices at 1535 Rancho Conejo Boulevard, Thousand Oaks, CA 91320.  Ceres's common stock is traded on the Nasdaq CM under the ticker symbol "CERE."

10.      Defendant Cheryl P. Morley ("Morley") has served as a director of Ceres since August 2011 and as Chair of the Board since September 2014.  According to the Company's website, Morley is Chair of the Compensation Committee and a member of the Audit Committee.

11.      Defendant Pascal Brandys ("Brandys") has served as a director of Ceres since September 2014.  Brandys previously served on the Board from December 1997 to March 2014.  According to the Company's website, Brandys is Chair of the Audit Committee and a member of the Nominating and Governance Committee.

12.      Defendant Richard Flavell ("Flavell") has served as a director of Ceres since June 2009.  According to the Company's website, Flavell is Chair of the Nominating and Governance Committee and a member of the Compensation Committee.

13.      Defendant Robert Goldberg ("Goldberg") has served as a director of Ceres since 1996.  According to the Company's website, Goldberg is a member of the Audit Committee and the Nominating and Governance Committee.

14.      Defendant Richard Hamilton ("Hamilton") has served as a director of Ceres since 2002.  According to the Company's website, Hamilton joined Ceres in 1998 and served as Chief Financial Officer ("CFO") until September 2002, at which time he was appointed President and Chief Executive Officer ("CEO").

15.      The Defendants identified in paragraphs 9 through 14 are collectively referred to herein as the "Individual Defendants."

16.      Defendant Parent is a Minnesota corporation and a party to the Merger Agreement.

17.      Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Ceres (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

19.     This action is properly maintainable as a class action.

20.     The Class is so numerous that joinder of all members is impracticable.  As of June 27, 2016, there were approximately 26,889,858 shares of Ceres common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

21.     Questions of law and fact are common to the Class, including, among others: (i) whether Defendants violated the 1934 Act; and (ii) whether Defendants will irreparably harm Plaintiff and the other members of the Class if Defendants' conduct complained of herein continues.

22.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

23.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

24.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, injunctive relief on behalf of the Class is appropriate.

**SUBSTANTIVE ALLEGATIONS**

*Background of the Company and the Proposed Transaction*

25.     Ceres is an agricultural biotechnology company that develops and markets seeds and traits to produce crops for animal feed, sugar, and other markets.

26.     The Company's advanced plant breeding and biotechnology platforms, which can increase crop productivity, improve quality, reduce crop inputs, and improve cultivation on marginal land, have broad application across multiple crops, including food, feed, fiber and fuel crops.

27.     Ceres markets its seed products under its Blade brand.  The Company also licenses its biotech traits and technology to other life science companies and organizations.

28.     On March 10, 2014, Ceres completed a registered public offering of 2,875,000 shares of common stock (including 375,000 shares purchased by the underwriter upon the exercise in full of their right to purchase up to an additional 375,000 shares to cover over-allotments) at a price to the public of $8.00 per share.  Ceres received approximately $20.8 million of proceeds from the offering, after deducting underwriting discounts and commissions and estimated offering expenses.

29.     On October 21, 2014, in order to purportedly facilitate the Company's identification and review of possible strategic options, the Board formed a strategic options committee ("Transaction Committee" or "Committee"), comprised of Individual Defendants Brandys and Morley, as well as Tom Kiley ("Kiley").

30.     On October 27, 2014, the Transaction Committee approved an engagement letter for Piper Jaffray & Co. ("Piper Jaffray") to act as the Board's financial advisor.

31.     The Company subsequently sought to initiate discussions with Land O'Lakes and its wholly owned subsidiary, Forage Genetics International ("FGI").  However, despite the formation of the Transaction Committee, Individual Defendant Hamilton, who was not a member

CLASS ACTION COMPLAINT

of the Committee, asked Piper Jaffray for an introduction to Land O'Lakes to explore mutual business opportunities, including the licensing of the Company's forage traits.

32.     On December 23, 2014, following Hamilton's communication with Land O'Lakes, and again without any involvement from the Transaction Committee, the Company and FGI executed a confidentiality agreement regarding a potential collaboration in forage sorghum.

33.     On January 8, 2015, Hamilton, Roger Pennell ("Pennell"), the Company's Vice President of Trait Development (and the party that negotiated an offer of employment from Parent prior to the Board's approval of the Merger Agreement), and Walter Nelson, the Company's Vice President of Product Development – none of whom were on the Committee – met with representatives of Parent and FGI  to discuss a potential collaboration in alfalfa, silage corn, and forage sorghum, as well as to discuss the Company's and Parent's respective businesses.  The parties, apparently without any involvement from the Transaction Committee, agreed to enter into a new confidentiality agreement related to pursuing collaboration opportunities in forage crops. The new confidentiality agreement was executed effective February 17, 2015.

34.     On March 26, 2015, Piper Jaffray contacted FGI and provided Parent with an investment summary of the Company, as well as a non-disclosure agreement, for the purpose of providing a preliminary introduction to the Company to assist Parent in evaluating whether to proceed with an in-depth investigation of a potential transaction with the Company.

35.     On April 2, 2015, Parent informed Piper Jaffray that Parent was not interested in executing a non-disclosure agreement related to the pursuit of a potential transaction with the Company or advancing a potential transaction process.  However, without Piper Jaffray or the Transaction Committee, FGI and the Company continued to consider certain commercial collaborations and agreed to continue to discuss and pursue potential collaborations in alfalfa, silage corn, and forage sorghum.

36.     On April 8, 2015, the Company filed an amendment to its amended and restated

CLASS ACTION COMPLAINT

certificate of incorporation, which effected a 1 for 8 reverse stock split of the Company's issued and outstanding shares of common stock.

37.     On April 9, 2015, Ceres issued a press release wherein it reported its financial results for the three months ended February 28, 2015.  The Company reported advancements across major areas for its breeding and genetic technologies, including biotech trait development, forage sorghum, and Persephone bioinformatics software, and provided an update on its business in Brazil.  The Company also reported that its bioinformatics software, Persephone, was being evaluated by new potential customers in plant genomics as well as in biomedical research and diagnostics, where genomics data is analyzed and viewed in a similar manner to plants.  At the time, Ceres touted that the software was licensed by Syngenta and Bayer CropScience.

38.     In May 2015, Ceres reported that Persephone was licensed to global seed potato developer, HZPC.  Persephone software was also being evaluated by new potential customers in plant genomics as well as in biomedical research and diagnostics, where genomics data is analyzed and viewed in a similar manner to plants.

39.     At a June 4, 2015 Board meeting, the Board discussed the prospects of the Company's business in the U.S., Brazil, and elsewhere, including the pursuit of opportunities to sell the Company's Persephone bioinformatics software system.

40.     On July 10, 2015, Ceres issued a press release wherein it reported its financial results for the three months ended May 31, 2015 and provided an update on its business and product development pipeline.  The Company reported that it had signed a collaboration and license agreement with a leading agricultural producer to introduce Ceres' biotech traits following positive results from greenhouse and field evaluations.  Separately, the Company announced that it had substantially increased plantings of its commercial forage sorghum hybrids in the U.S. over the prior year.

41.     Highlights from the July 10, 2015 press release included:

CLASS ACTION COMPLAINT

- Total revenues increased by $0.3 million to $1.1 million compared to the same period last year;

- Revenue from collaborative research and government grants increased by $0.3 million;

- Total cost and operating expenses decreased by $1.5 million;

- Research and development expenses decreased by $1.1 million;

- Selling, general and administrative expenses decreased by $0.2 million; and

- Ceres reported a net loss of $0.98 per share, compared to a net loss of $1.35 per share.

42.     On June 15, 2015, the Board expanded the scope of Piper Jaffray's engagement to review and advise on a broader variety of strategic options.

43.     On July 7, 2015, at a meeting of the Board, Piper Jaffray presented and discussed the outcome of its review of a broader variety of strategic options and the Board determined to raise additional capital with equity financing.

44.     According to *Yahoo Finance!*, on July 20, 2015, 480,900 shares of Ceres traded between $41.51 and $43.27.  During the prior and subsequent trading days, shares of Ceres traded for approximately $2.00 per share with daily volume ranging from approximately 30,000 to 69,000 shares.

45.     On July 30, 2015, Ceres completed a registered public offering of an aggregate of 1,200,000 shares of common stock at an offering price of $1.296 per share for estimated net proceeds of approximately $1.0 million.  In connection with the offering, Ceres issued warrants exercisable for one share of common stock, at an exercise price of $1.62, for each share purchased in the offering.  These warrants are exercisable at any time or from time to time, in whole or in part, beginning on January 30, 2016, and expire on January 30, 2021.  Ceres also issued warrants to purchase an aggregate of 24,000 shares of common stock at an exercise price of $1.944 per share to the placement agent as part of the placement agent's compensation.  These warrants were

CLASS ACTION COMPLAINT

to be exercisable beginning July 30, 2016 (the day the tender offer is set to expire), and expire on July 30, 2020.

46. On August 26, 2015, Ceres completed a registered public offering of an aggregate of 1,598,478 shares of common stock at an offering price of $1.22 per share for estimated net proceeds, together with the concurrent private placement, of approximately $1.7 million. In connection with the offering, Ceres issued warrants at an exercise price of $1.22 per share, exercisable for 0.75 shares of common stock, for an aggregate of 1,198,859 shares of common stock, for each share purchased in the offering. The warrants are exercisable beginning February 26, 2016, and expire on February 26, 2021. Ceres also issued warrants to purchase an aggregate of 31,970 shares of common stock at an exercise price of $1.83 per share to the placement agent as part of the agent's compensation. The warrants issued to the placement agent are exercisable beginning August 26, 2016, and expire August 26, 2020.

47. During the months of July and August 2015, shares of Ceres reached a high of $43.27 per share on July 20, 2015 and a low of $0.90 per share on August 6, 2015.

48. In August and September 2015, the Company and FGI continued discussions regarding potential collaborations. The Company and FGI negotiated, and on October 14, 2015 entered into, a Collaboration and Commercial Option Agreement for a multi-year collaboration with FGI to develop and commercialize improved alfalfa, further entangling Ceres with Parent and FGI.

49. On November 23, 2015, Ceres announced financial results for the fiscal year ended August 31, 2015 and provided positive updates on its business, stating, in relevant part, as follows:

> During fiscal year 2015, Ceres refocused its business on commercializing forage and feed products with a better balance of yield, energy and nutrition. Among other milestones, the company signed distribution agreements with several leading crop input providers and made significant progress in advancing its trait technology. U.S. seeds sales of its improved forage sorghum hybrids increased nearly sixfold in fiscal year 2015 over the previous season. Outside of forages, Ceres continued to add customers for its Persephone bioinformatics technology and received

additional patents related to its trait and iCODE technology.

For fiscal year 2016, Ceres plans to increase the number of companies distributing its forage sorghum seeds, expand its product portfolio and extend field evaluations of its seed products to additional regions.

Ceres President and CEO Richard Hamilton said that the momentum behind the company's entry in to the forage business continues to accelerate. "We are building our brand and market presence with improved conventional seed products ahead of the planned commercialization of crop traits. We have repeat orders in hand and are looking forward to expanding our sales and marketing reach through additional distributors," said Hamilton. He noted that he expects Ceres' trait portfolio to play a key role in the company's plans. "Traits provide the opportunity to significantly increase the value of the seed and expand beyond the historical acreage of forage sorghum." . . .

**Fiscal Year 2015 Financial Results**

Total revenues increased by $0.3 million to $2.7 million for the year ended August 31, 2015 compared to the previous fiscal year. Product sales increased by $0.3 million primarily due to increased biomass sales in Brazil. . . .

Research and development expenses decreased by $4.5 million to $9.7 million for the year ended August 31, 2015 compared to previous fiscal year. In the U.S., research and development expenses decreased by $4.2 million primarily due to reduced personnel and related expenses of $3.1 million, reduced external research and development and licensing expenses of $0.3 million, and reduced laboratory and agricultural supply costs of $0.8 million. In Brazil, research and development expenses decreased by $0.3 million as a result of decreased personnel and related expenses. . . .

50.    Also on November 23, 2015, Ceres issued its annual report on Form 10-K with the SEC.  Regarding its Persephone software, the Company stated as follows:

We have developed proprietary bioinformatics software, known as Persephone, to deal with the massive amounts of data generated in plant genomics. In September 2015, we licensed Persephone to global seed developer, KWS SAAT SE. Bayer CropScience, Syngenta Biotechnology and HZPC Holland BV, all multi-national life sciences companies, have also licensed Persephone as their primary genome browser. The technology is also being evaluated by other companies and institutions in plant genomics.

Persephone is a proprietary bioinformatics technology that enables storage and access to large, complex datasets as well as optimized data visualizations to view genetic data from public sources and proprietary databases. Our early need for the ability to manage large amounts of plant genomic data led to the effort to develop a scalable informatics platform, which resulted in our Persephone software. We believe that Persephone today is significantly more advanced than comparable

products, including many in the human healthcare space. The Persephone software includes a number of proprietary data management optimizations to quickly access and visualize very large datasets. This speed enables more dynamic visualizations, intuitive discovery and greater insights into genetic information. We believe that our direct experience using Persephone internally and our ability to continually develop and launch new versions with additional features and functions will enable us to further establish our market position in the plant sciences and expand into new markets, such as biomedical research and diagnostics.

The genomics and bioinformatics markets are growing rapidly. According to a May 2014 industry report from Allied Market Research, the bioinformatics market alone is forecast to grow from $3.4 billion in 2013 to $12.8 billion by 2020. Based on a 2014 report by the National Science Board, we estimate that the current market for Persephone consists of approximately 100,000 life science researchers who routinely access and utilize genetic and genomic information for research purposes and discovery. We believe that Persephone has immediate application in multiple scientific and medical fields that utilize genetic information, with a natural extension into clinical and diagnostic settings and additional potential end users in professional and consumer markets. Bioinformatics involves the development and storage methods that help in the organizing, analyzing, and retrieving of biological information. Today, a genome can be sequenced in a few hours for several thousand dollars — a task that took 13 years and $2.7 billion to accomplish during the Human Genome Project. Gathering genetic data is no longer a bottleneck for scientific researchers; however, a major hurdle remains in the efficient organization, analysis, and interpretation of the data. We expect that the low cost and widespread application of DNA sequencing and genetic testing in both plant and medical research will require improved tools, like our Persephone bioinformatics platform, to visualize, explore and mine genetic data. Based on internal performance metrics, and those reported by our current collaborators, we believe that our Persephone software offers a number of competitive performance advantages and has applications across a number of life science technology platforms that utilize genomics data.   . . .

We have established our Persephone bioinformatics software as a preeminent platform for storing, organizing, accessing and visualizing genetic information, and have displaced incumbent solutions at major life science companies. The software includes a number of proprietary data management optimizations to quickly access and visualize very large datasets. This speed enables more dynamic visualizations, intuitive discovery and greater insights into genetic information. We believe that our direct experience using Persephone internally and our ability to continually develop and launch new versions with additional features and functions will enable us to further establish our market position in the plant sciences and expand into new markets, such as biomedical research and diagnostics.

51.    On December 9, 2015, Pennell, again without the Committee, met with FGI. During the meeting, and in follow-on conversations in December 2015 and January 2016, FGI indicated a more significant interest in the Company, including a potential equity investment in the Company

CLASS ACTION COMPLAINT

and additional collaboration arrangements.

52.    On December 17, 2015, the Company completed another public offering consisting of (1) the issuance of an aggregate of 2,905,000 shares of common stock and warrants to acquire 2,905,000 shares of common stock, including the partial exercise of the underwriters' overallotment option of 2,305,000 shares of common stock and warrants to acquire 2,305,000 shares of common stock at an offering price of $0.40 per share (the warrants are exercisable beginning December 17, 2016 and expire December 17, 2021); and (2) the issuance of (i) 6,460 shares of preferred stock at an offering price of $1,000 per preferred share convertible into 16,150,000 shares of common stock and (ii) the issuance of warrants to purchase 16,150,000 shares of common stock at an exercise price of $0.40 per share.  Ceres also issued warrants to purchase an aggregate of 335,000 shares of common stock at an exercise price of $0.60 per share to the placement agent as part of the placement agent's compensation, exercisable beginning on December 17, 2016 and expiring on December 17, 2021.  The Company received net proceeds of approximately $6.4 million from the offering.

53.    On January 14, 2016, Ceres reported financial results for the three months ended November 30, 2015 and provided an update on its business.  Highlights included:

- Total revenues increased by $0.5 million to $0.9 million for the quarter ended November 30, 2015 compared to the same period last year;

- Total cost and operating expenses decreased by $1.6 million to $4.8 million;

- Research and development expenses decreased by $0.8 million to $1.7 million;

- Selling, general and administrative expenses decreased by $1.3 million to $2.1 million;

- For the quarter ended November 30, 2015, Ceres reported a net loss of $0.39 per common share, compared to a net loss of $0.96 per common share, for the quarter ended November 30, 2014;

- Company confirms its savings target; plans to achieve $8 to $10 million in

cash savings in FY2016 versus original estimate of $6 to $8 million;

- The Company significantly strengthened its balance sheet, successfully completing a $7.6 million equity offering, and further validated its technology in forage crops via a multi-year collaboration with Forage Genetics International; and

- For the upcoming planting season, Ceres plans to increase the number of companies distributing its forage sorghum seeds, expand its product portfolio and extend field evaluations of its seed products to additional regions.

54.    In late January 2016, the Company began to pursue bids for Persephone, contacting strategic and financial investors involved in crop biotechnology, bioinformatics, genomics, and software development.  Of these, the Company received tentative interest from four companies, with three companies agreeing to more advanced discussions under confidential disclosure agreements with the Company.

55.    On February 16, 2016, following a conversation between Hamilton and FGI, FGI informed Morley that Parent was interested in acquiring the Company.

56.    On February 17, 2016, the Board established a new Transaction Committee, comprised of Morley and Brandys, as well as then-directors Aflalo Guimaraes ("Guimaraes") and Kiley, to explore, review, evaluate, and approve possible strategic alternative and transactions.

57.    Also on February 17, 2016, the Board decided to re-engage Piper Jaffray as a financial advisor.

58.    In late February and early March 2016, Piper Jaffray reached out to parties potentially interested in acquiring the Company or certain of its assets or businesses.

59.    At the Company's 2016 annual meeting of stockholders held on April 5, 2016, Guimaraes and Kiley did not stand for reelection to the Board.  Following such meeting, Guimaraes and Kiley left the Board and the Transaction Committee, and Morley and Brandys remained as members of the Transaction Committee.

60.    On April 14, 2016, the Company reported financial results for the three months

CLASS ACTION COMPLAINT

ended February 29, 2016 and provided an update on its business.  As reported by the Company, during its fiscal second quarter, Ceres launched additional forage sorghum seed products following favorable field results from 2015.  Over the past year, the Company increased the size of its distribution network and expected to continue to add new distributors to carry its products. During the quarter, the performance of its leading sorghum trait exceeded expectations in its largest scale field evaluation to date.  The Company plans to scale up seed for commercial production and move ahead with larger scale field evaluations for its pre-commercial traited hybrids.  Paul Kuc ("Kuc"), Ceres' CFO, indicated that the Company is now fully benefiting from the reduced cash requirements of its forage and traits business model, stating as follows:

> For 2016, we expect to continue to report reductions in expenses compared to last year as we benefit from our realignment as well as lower general and administrative expenses going forward. At the same time, we are excited about the opportunity to increase product sales and intend to pursue grant funding to defray the costs and increase speed of developing new products. We will also continue to evaluate the potential sale of intellectual property and other assets, especially in non-core areas.

61.     In the press release announcing the results, the Company reported continued improvement in key financial metrics, including:

- Total cost and operating expenses decreased by $4.8 million to $3.7 million for the quarter ended February 29, 2016 compared to the same period last year;

- Cost of revenues decreased by $1.3 million to $0.8 million;

- Research and development expenses decreased by $1.0 million to $1.4 million;

- Selling, general and administrative expenses decreased by $2.5 million to $1.4 million; and

- For the quarter ended February 29, 2016, Ceres reported a net loss of $1.1 million, or $0.09 per common share, compared to a net loss of $8.1 million, or $1.34 per common share, for the quarter ended February 28, 2015.

62.     On April 29, 2016 and May 3, 2016, respectively, the Company received statements of interest from "Company C" and "Company D" to acquire the Company's Persephone business.

63.     On May 12, 2016, Parent submitted a proposal to acquire Ceres for $0.40 per common share, requested (and obtained) an exclusivity period, and indicated that its revised proposal was its "best and final" offer.  Additionally, Parent indicated that its bid price for the Company would not change if the Company realized a sale of Persephone.

64.     However, although the Company negotiated an exception to the exclusivity agreement that permitted the Company to continue its efforts to sell Persephone, the Transaction Committee determined not to focus the Company's efforts on a sale of the asset.  The Solicitation Statement fails to disclose whether the Board, Company management, or Piper Jaffray ever analyzed the value of Persephone, or whether it ever received preliminary pricing terms from Company C or Company D.

65.     On or about June 9, 2016 (and as revised on June 28, 2016), Land O'Lakes agreed to employ Pennell, the Company's Vice President of Trait Development, and one of the main negotiators of the Proposed Transaction.  Thus, as the Company was purportedly negotiating and objectively evaluating the Proposed Transaction, Pennell negotiated for employment with Land O'Lakes, one of the nation's largest cooperatives, ranking 203 on the Fortune 500 (and/or its subsidiary FGI) for an agreement that provides him with a "hiring bonus" of $595,000 (approximately 5% of the merger consideration that will be paid to common shareholders) and an annual base salary of $295,000 (nearly a 20% raise from his base salary with Ceres).

66.     On June 16, 2016, despite the fact that the Company began to experience marked improvements in its performance, the Board approved the Proposed Transaction to sell all of Ceres' equity to Land O'Lakes for inadequate consideration that fails to account for these improvements, Parent's and FGI's special interests in Ceres' assets, or Ceres' key software, Persephone.

***The Merger Agreement***

67.     The parties executed the Merger Agreement on June 16, 2016.

68.     The Merger Agreement contains a "no solicitation" provision that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 5.2(a) of the Merger Agreement states:

(a) From and after the date of this Agreement until the earlier of the Offer Acceptance Time or the time, if any, at which this Agreement is terminated in accordance with Section 8.1 (the "Pre-Closing Period"), the Company agrees that it shall not (and that the Company shall cause each Company Subsidiary not to), and that it shall use its best efforts to cause its Representatives not to, directly or indirectly, solicit, initiate, knowingly encourage or knowingly facilitate the submission or an announcement of any Company Competing Proposal or the making of any inquiry, offer or proposal that could reasonably be expected to lead to any Company Competing Proposal or, except as otherwise specifically provided for in this Section 5.2, (i) participate in any negotiations regarding any Company Competing Proposal, (ii) afford any Person access to the business, properties, assets, employees, officers, directors, books or records of the Company or any Company Subsidiary, or furnish to any Person any nonpublic information relating to the Company or any Company Subsidiary, in each case, in connection with any Company Competing Proposal or any inquiry, offer or proposal that could reasonably be expected to lead to any Company Competing Proposal, (iii) engage in discussions with any Person with respect to any Company Competing Proposal or any inquiry, offer or proposal that could reasonably be expected to lead to any Company Competing Proposal, (iv) waive, terminate, modify or release any Person from any provision of or grant any permission, waiver or request under, or fail to enforce, any "standstill" or similar agreement or obligation (except that the Company may waive such a "standstill" or similar agreement or obligation solely to permit a Person privately to make a Competing Company Proposal to the Company Board if the Company Board has determined in good faith after consultation with the Company's outside legal counsel that the failure to take such action would be inconsistent with the fiduciary duties of the members of the Company Board under Delaware law), (v) approve any transaction under, or any Person becoming an "interested stockholder" under, Section 203 of the DGCL, (vi) enter into any letter of intent, agreement in principle, term sheet, acquisition agreement, merger agreement, option agreement, joint venture agreement, partnership agreement or other Contract relating to, or any agreement or commitment (X) contemplating or otherwise providing for, any Company Competing Proposal or (Y) requiring the Company to abandon, terminate or fail to consummate the transactions contemplated hereby or to breach its obligations hereunder, or (vii) resolve, propose or agree to do any of the foregoing. The Company shall immediately cease (and shall cause each Company Subsidiary to cease), and use its best efforts to cause its Representatives to cease, any and all discussions or negotiations with any Person conducted heretofore with respect to any Company Competing Proposal and shall use its reasonable best efforts to cause any such Person (or its agents or advisors) in possession of any nonpublic information relating to the Company or any Company Subsidiary that was furnished by or on behalf of the Company or any Company Subsidiary (including

by any Representative of the Company) to return or destroy (and confirm destruction of) all such information within five (5) Business Days of the date hereof. The Company shall immediately terminate the access of any Person to the electronic data room hosted by Merrill Corporation. The Company shall promptly, following the execution of this Agreement, inform its Representatives of the Company's obligations under this Section 5.2. Without limiting the foregoing, the Company understands, and acknowledges and agrees, that any breach of the obligations set forth in this Section 5.2(a) by any Company Subsidiary or any Representative of the Company shall be deemed to be a breach of this Section 5.2(a) by the Company.

69.     Further, the Company must promptly advise Land O' Lakes of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal.  Section 5.2(c) of the Merger Agreement states:

(c) The Company shall notify Parent in writing promptly (but in no event later than twenty-four (24) hours) after receipt by the Company or any Company Subsidiary or any of the Company's Representatives of any Company Competing Proposal or any inquiry, offer or proposal that would reasonably be expected to lead to a Company Competing Proposal, or any request for nonpublic information relating to the Company or any Company Subsidiary or for access to the business, properties, assets, employees, officers, directors, books or records of the Company or any Company Subsidiary by any Person, in each case in connection with any Company Competing Proposal or inquiry, offer or proposal that would reasonably be expected to lead to a Company Competing Proposal. Such notice shall identify the Person making, and the material terms and conditions of, any such Company Competing Proposal, inquiry, offer, proposal or request. Commencing upon the provision of any notice referred to above in this Section 5.2(c), the Company shall keep Parent informed on a reasonably prompt basis of any material developments with respect to any such Company Competing Proposal and as promptly as practicable provide Parent with copies of any material written materials relating to such Company Competing Proposal or any material change to the financial or other material terms and conditions thereof. The Company shall promptly provide Parent with any nonpublic information concerning the business, present or future performance, financial condition or results of operations of the Company (or any Company Subsidiary), provided to any Person that was not previously provided to Parent. The Company shall provide Parent with at least 24 hours' prior notice (or such lesser period of prior notice provided to the members of the Company Board) of any meeting of the Company Board at which the Company Board is reasonably expected to consider any Company Competing Proposal.

70.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Land O' Lakes a "matching right" with respect to any

"Superior Proposal" made to the Company.  Section 5.2 of the Merger Agreement provides, in relevant part:

> (d) Except as otherwise specifically provided for in this Section 5.2(d), the Company Board shall not (i) approve, adopt or recommend or propose publicly to approve, adopt or recommend any Company Competing Proposal, (ii) other than in the case of a Company Competing Proposal in the form of a tender or exchange offer, fail to affirm publicly the Company Board Recommendation upon Parent's written request within five (5) Business Days after such request after a public announcement of a Company Competing Proposal, (iii) fail to recommend against acceptance of any tender offer or exchange offer (other than the Offer or any other tender offer or exchange offer by Parent or Merger Sub) for the Common Shares or the Preferred Shares prior to the eleventh (11th) Business Day after the commencement of such tender or exchange offer pursuant to Rule 14d-2 under the Exchange Act, (iv) fail to make the Company Board Recommendation, (v) withdraw, change, amend, modify or qualify, or otherwise propose publicly to withdraw, change, amend, modify or qualify, in a manner adverse to Parent, the Company Board Recommendation, or (vi) resolve or agree to take any of the foregoing actions (any of the foregoing, a "Company Change of Recommendation").  Notwithstanding anything in this Section 5.2(d) to the contrary, at any time prior to the Offer Acceptance Time, the Company Board may make a Company Change of Recommendation in response to . . . a Company Superior Proposal, if and only if, (X) the Company complies with Section 5.2(e), (Y) Parent does not make, within the notice period (and any extensions thereof) described in Section 5.2(e), an offer that the Company Board determines in good faith, after consultation with the Company's outside legal counsel and financial advisor, to be at least as favorable to the stockholders of the Company as such Company Superior Proposal and (Z) following the expiration of the notice period (and any extensions thereof) described in Section 5.2(e), the Company Board determines, in good faith, after consultation with the Company's outside legal counsel, that the failure to take such action would be inconsistent with the fiduciary duties of the members of the Company Board under applicable Law. . . .

> Prior to the Company making a Company Change in Recommendation in response to a Company Superior Proposal, the Company shall provide Parent with four (4) Business Days' prior written notice (it being understood and agreed that each material amendment to the applicable Company Superior Proposal, including any revision to price, shall require a new notice and an additional two (2) Business Day period and that there may be multiple extensions of the notice period) advising Parent that the Company Board intends to take such action and contemporaneously providing to Parent a copy of the Company Superior Proposal, a copy of any proposed agreements for such Company Superior Proposal (including any financing commitments related thereto) (or, in each case, if not provided in writing to the Company or any of its Representatives, a written summary of the terms thereof) and the identity of the Person making the Company Superior Proposal, and during such four (4) Business Day period (or subsequent two (2) Business Day period or periods), (x) the Company shall negotiate, and cause its Representatives to negotiate, with Parent and its Representatives in good faith (to the extent Parent wishes to negotiate) to enable Parent to determine whether to propose revisions to the terms of this Agreement or any other agreement related to the Transactions such that such Company Superior Proposal would no longer constitute a Company Superior Proposal and (y) the Company shall consider in good faith any proposal by Parent to amend the terms and conditions of this Agreement or any other

agreement related to the Transactions such that such Company Superior Proposal would no longer constitute a Company Superior Proposal.

71.     Further, the Merger Agreement contains a provision for a "termination fee" of $695,000 payable by the Company to Land O' Lakes if the Individual Defendants cause the Company to terminate the Merger Agreement.

72.     Finally, as part of the Merger Agreement, Parent only requires the tender of one share more than 50% of Ceres' outstanding shares in order to effectuate the Proposed Transaction (the "Minimum Tender Condition").  If the Minimum Tender Condition is satisfied, Parent may purchase from the Company, at a price per share equal to the proposed merger consideration, up to the number of "Top-Up Shares" that, when added to the number of common shares already owned by Parent would represent at least 90% of the common shares outstanding immediately after giving effect to the issuance of the Top-Up Shares.

73.     The Company's officers and directors also entered into a tender and support agreement, pursuant to which they will tender their shares of Company common stock in the tender offer.  Accordingly, such shares are already locked up in favor of the Proposed Transaction.

74.     According to the analyses of Piper Jaffray, as recently as June 16, 2015, Ceres shares traded as high as $2.33, almost six times more than the consideration in the Proposed Transaction.  Indeed, numerous analyses performed by Piper Jaffray indicate that $0.40 per share is inadequate.  For example, in its *Discounted Cash Flow Analysis* ("DCF analysis"), Piper Jaffray derived an implied per share valuation range as high as $1.17.  Similarly, in its *Selected Publicly Traded Companies Analysis—Ag Biotech*, Piper Jaffray observed that the median and mean of the enterprise value-to-2016 revenue multiples of those companies yields a range of implied per-share values for Ceres common shares of as high as $1.05.

75.     Furthermore, the offer fails to compensate Ceres shareholders for the Company's valuable Persephone software business, which it has recently licensed to global leaders such as

- 19 -

CLASS ACTION COMPLAINT

KWS SAAT SE, Bayer CropScience, Syngenta Biotechnology, and HZPC Holland BV, each of which have lauded the benefits and performance of the software.

***The Interests of the Company's Officers and Directors***

76.     Certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

77.     For example, Individual Defendant Hamilton and executives Kuc and Wilfriede van Assche ("van Assche") stand to receive $1,079,528, $747,792, and $694,521, respectively, in cash and equity.

78.     Moreover, Land O'Lakes agreed to employ Pennell, the Company's Vice President of Trait Development, and one of the main negotiators of the Proposed Transaction.

***Materially Incomplete Solicitation Statement***

79.     Defendants filed the Solicitation Statement with the SEC in connection with the Proposed Transaction.   The Solicitation Statement omits material information that must be disclosed to Ceres's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

80.     The Solicitation Statement omits material information with respect to the process and events leading up to the Proposed Transaction, as well as the opinions and analyses of Piper Jaffray.   This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

81.     For example, the Solicitation Statement fails to disclose whether the non-disclosure agreements executed between the Company and the various parties contained standstill and/or "don't ask, don't waive" provisions.

82.     The Solicitation Statement fails to disclose the estimated value of Persephone throughout the process and currently, as well as whether the estimated value was factored into Piper Jaffray's analyses.

83.     The Solicitation Statement fails to disclose the timing and nature of all communications regarding future employment or directorship of Ceres' officers and directors, including who participated in all such communications.

84.     With respect to Ceres' financial projections, the Solicitation Statement fails to disclose the nature and basis of the "risk adjustments" made, and the basis for the adjustments to projected revenue, costs of goods sold, and gross profit.

85.     The Solicitation Statement fails to disclose which warrants were included in Piper Jaffray's calculation of the Transaction Implied Company Enterprise Value.

86.     With respect to Piper Jaffray's *Selected Publicly Traded Companies Analyses*, the Solicitation Statement fails to disclose whether the enterprise values of the comparable companies included outstanding warrants (utilizing the Black Scholes Value).

87.     With respect to Piper Jaffray's *Selected Publicly Traded Companies Analyses*, the Solicitation Statement fails to disclose whether Piper Jaffray performed any benchmarking in its selection and analysis.

88.     With respect to Piper Jaffray's *Selected Publicly Traded Companies Analysis—Comparable Financial Profile*, the Solicitation Statement fails to disclose whether Piper Jaffray distinguished between those companies that were developing companies (that were yet to demonstrate earnings) as compared to those that were failing companies (that had previously had positive earnings), and, if not, the basis for failing to do so.

89.     The Solicitation Statement fails to disclose the basis for Piper Jaffray utilizing projected revenues in its *Selected Publicly Traded Companies Analyses* but using last twelve months revenues in its *Selected M&A Transaction Analysis*, and whether such alternative analyses were presented to the Board.

90.     With respect to Piper Jaffray's *Premiums Paid Analysis*, the Solicitation Statement fails to disclose the basis for including unrelated transactions such as those involving, *inter alia*,

CLASS ACTION COMPLAINT

AOL, Inc., Seagate Technology, IBM, Corp., and Alliance Fiber Optic Products.

91.     With respect to Piper Jaffray's *DCF Analysis*, the Solicitation Statement fails to disclose the basis for further reducing managements' projections to account for potential financing costs, and whether such adjustment was discussed with the Board and/or management; the basis for the exorbitant discount rate of between 50% to 60%; and the basis for selecting the least favorable EBITDA multiples derived from the comparison to the "Big Six" despite the more relevant multiples derived from the "AG Biotech" companies.

92.     The Solicitation Statement fails to disclose the basis for calculating the value of Ceres' net operating loss, but then excluding it from the implied *DCF* ranges purportedly because of "the significant assumptions and considerations necessary to determine the applicability to any specific acquirer" when the Proposed Transaction is being made by a determinate acquirer with public financials.

## COUNT I

### (Claim for Violation of Section 14(e) of the 1934 Act Against Defendants)

93.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

94.     Section 14(e) of the 1934 Act states, in relevant part, that:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders[.]

95.     Defendants disseminated the misleading Solicitation Statement, which contained statements that, in violation of Section 14(e) of the 1934 Act, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially misleading.

96.     The Solicitation Statement was prepared, reviewed, and/or disseminated by Defendants.

97.     The Solicitation Statement misrepresented and/or omitted material facts in connection with the Proposed Transaction as set forth above.

98.     By virtue of their positions within the Company and/or roles in the process and the preparation of the Solicitation Statement, Defendants were aware of this information and their duty to disclose this information in the Solicitation Statement.

99.     The omissions and misleading statements in the Solicitation Statement are material in that a reasonable shareholder will consider them important in deciding whether to tender their shares in connection with the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Solicitation Statement and in other information reasonably available to shareholders.

100.    Defendants knowingly or with deliberate recklessness omitted the material information identified above in the Solicitation Statement, causing statements therein to be materially incomplete and misleading.

101.    By reason of the foregoing, Defendants violated Section 14(e) of the 1934 Act.

102.    Because of the false and misleading statements in the Solicitation Statement, Plaintiff and the Class are threatened with irreparable harm.

103.    Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### (Claim for Violation of 14(d) of the 1934 Act Against Defendants)

104.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

105.    Section 14(d)(4) of the 1934 Act states:

Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

106.    Rule 14d-9(d) states, in relevant part:

CLASS ACTION COMPLAINT

> Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof[.]

Item 8 requires that directors must "furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

107.    The Solicitation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits the material facts set forth above, which renders the Solicitation Statement false and/or misleading.

108.    Defendants knowingly or with deliberate recklessness omitted the material information set forth above, causing statements therein to be materially incomplete and thus misleading.

109.    The omissions in the Solicitation Statement are material to Plaintiff and the Class, and they will be deprived of their entitlement to make a fully informed decision with respect to the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

110.    Plaintiff and the Class have no adequate remedy at law.

## COUNT III

**(Claim for Violation of Section 20(a) of the 1934 Act
Against the Individual Defendants and Land O' Lakes)**

111.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

112.    The Individual Defendants and Land O' Lakes acted as controlling persons of Ceres within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Ceres and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to influence and control and did influence and

control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

113.   Each of the Individual Defendants and Land O' Lakes was provided with or had unlimited access to copies of the Solicitation Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

114.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.   The Solicitation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly connected with and involved in the making of the Solicitation Statement.

115.   Land O' Lakes also had direct supervisory control over the composition of the Solicitation Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Solicitation Statement.

116.   By virtue of the foregoing, the Individual Defendants and Land O' Lakes violated Section 20(a) of the 1934 Act.

117.   As set forth above, the Individual Defendants and Land O' Lakes had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the 1934 Act.

118.   As a direct and proximate result of Defendants' conduct, Plaintiff and the Class are threatened with irreparable harm.

119.   Plaintiff and the Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.    In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.    Directing the Individual Defendants to file a Solicitation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.    Declaring that Defendants violated Sections 14(e), 14(d), and 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: July 14, 2016

**BRODSKY & SMITH, LLC**

By: _____
EVAN J. SMITH (S.B. # 242352)
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
(877) 834-2590

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Gina M. Serra
Jeremy J. Riley
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

CLASS ACTION COMPLAINT

1

2    **RYAN & MANISKAS, LLP**
     Katharine M. Ryan
3    Richard A. Maniskas
     995 Old Eagle School Road, Suite 311
4    Wayne, PA 19087
     (484) 588-5516

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT